**SOKAOGON CHIPPEWA COMMUNITY, Plaintiff,**

v.

**EXXON CORPORATION, a corporation chartered in the State of New Jersey; State of Wisconsin; Forest County, a political subdivision of the State of Wisconsin; Langlade County, a political subdivision of the State of Wisconsin; Oneida County, a political subdivision of the State of Wisconsin; Defendants.**

**Case No. 86–C–0599.**

United States District Court, E.D. Wisconsin.

Oct. 6, 1992.

Earl A. Charlton, Charlton & Esser, Milwaukee, Wis., Milton Rosenberg, Madison, Wis., for plaintiff.

John D. Niemisto, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for defendant State of Wis.

Charles G. Curtis, Jr., Foley & Lardner, Madison, Wis., for defendant Exxon Corp.

Robin Stowe, Langlade County Corp. Counsel, Antigo, Wis., for defendant Langlade County.

Fred W. Kawalski, Forest County Corp. Counsel, Crandon, Wis., for defendant Forest County.

Lawrence R. Heath, Oneida County Corp. Counsel, Rhinelander, Wis., for defendant Oneida County.

Elsa Lamelas, Asst. U.S. Atty., Milwaukee, Wis., for defendant U.S.

Patrick M. Brady, Brady & Molinaro, S.C., Wausau, Wis., for Connor Forest Industries, Inc.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court are the defendants' motions for summary judgment. Specifically at issue is the plaintiff's right to possess and occupy 12 mile by 12 mile tract of land in Northern Wisconsin ("the subject territory"). Each of the named defendants has legal title to portions of the subject territory, and the plaintiff has petitioned this Court for declaratory relief upholding their rights in the land, which they allege are protected by treaties more than a century old.

## I. FACTUAL BACKGROUND

### A. CHRONOLOGY

The Sokaogon Chippewa Community ("Sokaogon") is a Native American tribe which has been known in the past as the Sokaogon Band, the Mole Lake Band, the Post Lake Band, the Rice Lake Band, the Pelican Lake Band, the Lake Bands, and the Lost Band. Complaint at ¶ 1. The Sokaogon are descendants of the Lake Superior Chippewa tribes that roamed the Northern Wisconsin area before the settling of Wisconsin occurred in the early to mid-1800's. The members of the tribe currently live on a Federal reservation in Forest County, Wisconsin (the "Mole Lake Reservation"). Complaint at ¶ 1.

In the middle of the nineteenth century, the United States was rapidly expanding its boundaries. Settlers moved westward relentlessly, and the federal government encouraged this expansion through land grants and homesteading. Clearings sprung up on land that had formerly been inhabited only by Native Americans. When the rights of the settlers and Native Americans conflicted, the government responded by pushing the tribes further west, out of the paths of the settlers. This was accomplished by a series of treaties and Congressional and executive orders, through which the Native Americans ceded their rights to the land in exchange for annuities and small reservations. Brown, *Bury My Heart at Wounded Knee*, Ch. 1.

During this period of expansion, Native Americans already occupying land were deemed as possessing two types of interests in non-reservation land. "Aboriginal title" was the term given to the tribe's right to occupy land claimed by settlers in fee title and was based upon the "actual, exclusive and continuous occupancy" of the land prior to white settlement. *United States v. Bouchard* ("*Bouchard*"), 464 F.Supp. 1316, 1347 (W.D.Wis.1978), citing *Tee–Hit–Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955);

*Strong v. United States,* 518 F.2d 556, 207 Ct.Cl. 254 (1975). Aboriginal title was good against any other claims to the land except for those of the United States, which could extinguish Native Americans' title without the payment of compensation normally required by the Fifth Amendment. *Bouchard,* 464 F.Supp. at 1347; *Tee–Hit–Ton,* 348 U.S. at 284–85, 75 S.Ct. at 319–20 (aboriginal title is not compensable, since it is a right of occupancy rather than a property right).

In comparison, "treaty-recognized title" meant that Congress had recognized the Native Americans' right to occupy the land as a legally protectible interest, which could be extinguished only by payment of compensation. *Lac Courte Oreilles Band v. Voigt (LCO I),* 700 F.2d 341, 352 (7th Cir.1983), citing *United States v. Sioux Nation,* 448 U.S. 371, 415 n. 29, 100 S.Ct. 2716, 2740 n. 29, 65 L.Ed.2d 844 (1980). In the early to mid–19th century, much of this country's expansion was accomplished through treaties in which Native Americans ceded land to which they had aboriginal title in exchange for treaty-recognized title to smaller portions of that land. Wilkinson, *To Feel The Summer In The Spring: The Treaty Fishing Rights of the Wisconsin Chippewa,* 1991 Wis.L.Rev. 375, 385.

One such treaty was the Treaty of the Chippewa, signed in 1842 ("the 1842 Treaty"), in which Native Americans conveyed a vast tract of land in Northern Wisconsin and the Upper Peninsula of Michigan to the United States. This area began to attract white settlers in the mid–1800's, as rich mineral deposits had recently been discovered both on and underneath the land. Keller, *An Economic History of Indian Treaties in the Great Lakes Region,* American Indian Journal, February 1978, 2, 16. The 1842 Treaty was intended to facilitate the settlement of this land and encourage mineral development. Due to its underlying purpose, the 1842 Treaty was commonly called "the Miners' Treaty." Exxon, App. at 298.

The treaty effectively extinguished any aboriginal title or treaty-recognized title the Lake Superior Chippewa had formerly held over the land. However, the Chippewa retained their "usual privileges of occupancy" until they were "required to remove by the President of the United States." [1] Article VI of the 1842 Treaty provides that "[t]he Indians residing on the Mineral district shall be subject to removal therefrom at the pleasure of the President of the United States." [2] Nevertheless, the government did not anticipate a rapid settlement of the area or a need for early removal and both the Chippewa and the Indian agents [3] in the area probably believed that the usual privileges of occupancy could be exercised without interference for generations to follow. *United States v. Bouchard,* 464 F.Supp. at 1327. The Post Lake Band, designated as the "Lake Bands" by the 1842 Treaty, accepted these terms through Chief Ke-che-Wabishashi, or Chief Martin.

---

**1.** The "usual privileges of occupancy" reserved for the Chippewa by the 1842 Treaty have been interpreted by the Seventh Circuit as consisting of both the right to possess and occupy the land and the right to conduct usufructuary activities within the area. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341 (7th Cir.1983). "Usufructuary" is defined as the use and enjoyment of the profits of property belonging to another as long as that property is not damaged or altered in any way. In *Lac Courte Oreilles Chippewa Ind. v. State of Wisconsin,* 653 F.Supp. 1420 (W.D.Wis.1987), the court listed each particular usufructuary activity engaged in by members of various Lake Superior Chippewa tribes in the middle of the 19th century. *Id.* at 1426–28. The court also held that the 1842 Treaty permitted the Chippewa to continue with these practices on the land until ordered to remove from it by the President of the United States.

**2.** Exxon concedes that the land in which it holds an interest is covered by the 1842 Treaty, even though it has asserted that a portion of the subject territory was ceded to the United States by the Chippewa through the 1837 Treaty. Exxon's Findings of Fact at ¶ 19. The 1837 Treaty is similar in substance to the 1842 Treaty, but concerns a different portion of land.

**3.** The term "Indian agent" is used to describe employees of the Department of the Interior who served as liaisons between the Native Americans and the Commissioner of Indian Affairs.

The Post Lake Band had used the land ceded under the 1842 Treaty for hunting, fishing, trapping, harvesting wild rice, and collecting maple sugar. Exxon, App. at 1387. They knew that there were copper deposits under the ground, and there is evidence that some earlier tribes had mined the copper near Lake Superior before the eighteenth century. Exxon, App. at 503–29, 536–39. However, there is no indication that the Chippewa had ever mined the land, although they did occasionally collect surface copper and may have used it for religious purposes. Exxon, App. at 441.

Apparently, the Chippewa understood that their rights to live, hunt and fish upon the land did not override the United States' rights to the minerals underneath. One of the objectives of the 1842 Treaty was to reserve the mineral wealth of Wisconsin and Michigan for the government. Witnesses to the treaty negotiations have confirmed the government's records that the Chippewa were informed that the "principal benefit your great Father expects from your lands at present is, the removal of the minerals which are said to be on them; and not that the whites intend to settle on them at present." Exxon, App. at 1141, 1007. Many of the tribes with representatives at the negotiations for the 1842 Treaty indicated that the purpose of the treaty was to convey mineral rights to the government. Exxon's Proposed Findings of Fact, ¶¶ 43–54. Nevertheless, the Chippewa were assured that they would be able to use the land for an indefinite period of time until mining commenced or until white settlers came on to the lands. Exxon, App. at 938, 948, 961, 982, 1007–08. Moreover, they were told that they could remain on the land even after whites had settled there if they were "not in the way of the whites, and live[d] on terms of friendship with them." Exxon, App. at 938.

Development in the ceded territory occurred at an unforeseeable pace and it soon became clear that the Chippewa would not be able to exercise their rights on the land without disturbing the white settlers. In 1850, President Zachary Taylor sought to revoke the Chippewa's privileges of occupancy and attempted to remove them from the ceded territory completely through the Presidential Removal Order of 1850. He intended to relocate them in Minnesota, west of the Mississippi and far from the proposed paths of westward settlers.

In an effort to enforce the Removal Order and lure the Lake Superior bands west of the Mississippi, the Indian Office announced that the annuities due under the 1842 Treaty would be paid on October 15, 1850 in Sandy Lake, Minnesota, rather than at La Pointe in Wisconsin. Although the Chippewa did not wish to leave their homelands, many made the arduous journey to Minnesota to collect supplies. Unfortunately, the Indian agent was delayed in St. Louis and did not arrive in Minnesota until late November. In the meantime, many Native Americans had perished from malnutrition and disease. When the supplies were finally distributed on December 3, the waterways used by the Chippewa were frozen and the tribes were forced to walk all the way back to their camps in Wisconsin. This bitter experience strengthened their resolve to stay in Wisconsin. Danziger, *They Would Not Be Moved*, Minnesota History, Spring 1973, 175, 177–78 (Exxon App. at 283–284).

The plight of the Chippewa garnered national attention, and both whites and Native Americans protested the President's Removal Order. A band of Chippewa chiefs even travelled to Washington, D.C. in 1852 to secure President Millard Fillmore's promise not to enforce the order. The President kept his word, and the order was never enforced. However, the Chippewa had become fearful of losing their right to live upon their ancestral homelands. *See e.g., United States v. Bouchard*, 464 F.Supp. at 1329. In 1853, leaders from several of the Northern Wisconsin tribes wrote a petition to the government in which they explained:

We are at last convinced, that the perpetuity of our nation can only be secured by permanent settlements. We are awakened to the necessity of acquiring a possession which shall be our own and may not be overflowed by the multitudes

who come from your cities and towns to dwell in the forests.

Exxon App. at 1179.

In the 1850's, federal policy toward Native Americans shifted from the westward relocation of Eastern tribes to the setting aside of smaller parcels of land as reservations. Wisconsin's citizens and legislature did not object to the Lake Superior Chippewa remaining in Wisconsin, as they were "a peaceable, quiet, and inoffensive people." *Bouchard*, 464 F.Supp. at 1330.

As a result of these events, the Chippewa and the United States negotiated the Treaty of the Chippewa in 1854 ("the 1854 Treaty"). Even though the government may have hoped to remove all of the Lake Superior Chippewa to Minnesota, it soon became evident that this would be impossible. Indian Agent Henry C. Gilbert, who had warned the government in 1853 that the Chippewa would "sooner submit to extermination than comply" with the 1850 Removal Order, was able to negotiate the treaty only by promising the Chippewa reservations in their homeland. "Without yielding these points," he wrote in October of 1854, "it was idle for us to talk about a treaty." *Bouchard*, 464 F.Supp. at 1331; *see also* Danziger, *They Would Not Be Moved*, Minnesota History, Spring 1973 at 178.

The government hoped that consolidation of Native Americans on reservations would hasten their assimilation into American society and better enable Indian agents to oversee the tribes' development. Apparently, it had been difficult for the agents to contact tribe members when necessary, due to their nomadic habits. By keeping them on defined parcels of land, Indian agents would know where their charges were at any given time. Concentrating Native Americans on reservations would "induce them to adopt the habits and pursuits of civilized life" as well. Exxon, App. at 698,

citing from the Report of the Commissioner of Indian Affairs, November 30, 1857.

To allow this policy of concentration and "civilization" to take effect, the 1854 Treaty "set apart, and [withheld] from sale, for the use of the Chippewas of Lake Superior ... tracts of land." 1854 Treaty, Art. II. The government manifested its intent that the Chippewa should settle upon these reservations by referring to them as "homes hereby set apart for them" in Article XI. The treaty also spoke of the land or points set aside for the Chippewa in Articles V and VIII. Three reservations of land were set aside for the exclusive benefit of the Lake Superior Chippewa in Northern Wisconsin.

One of these reservations was for the La Pointe band "and such other Indians as may see fit to settle with them.[4]" 1854 Treaty, Art. II, § 2. There were another two parcels of land near Lac de Flambeau and Lac Courte Oreilles set aside for "the other Wisconsin bands." 1854 Treaty, Art. II, § 3. A copy of the treaty shows that Chief Me-gee-see and Chief Ne-gig, both of the Post Lake Chippewa, were present at the 1854 Treaty negotiations and signed the treaty as members of the Lac de Flambeau Band by making their "X" mark. 1854 Treaty (Exxon, App. at 120).[5] Therefore, under the 1854 Treaty, the Post Lake Band became entitled to live at the reservations at La Pointe, Lac de Flambeau, or Lac Courte Oreilles.

Regardless of whatever rights the Post Lake Band kept or lost after the ratification of the 1854 Treaty, they maintained approximately the same nomadic lifestyle as they had previously. Contrary to the government's hopes and expectations, they did not establish a permanent residence at any of these reservations, although they would travel to Lac de Flambeau to collect their annuity payments. Their history throughout the decades following the 1854 Treaty is marked with objections to the

---

**4.** This is the land known today as the "Bad River Reservation."

**5.** There is other evidence in the record that Chief Me-gee-see may not have been present at La Pointe when the Chippewa agreed to the

terms of the 1854 Treaty. See Exxon App. at 2028 ("Chief Mi-gee-see ... was unable to be there"); 2047 ("Chief Megeesee could not go on account of having burnt his feet."). However, it is uncontroverted that the Post Lake Band was represented by at least Chief Ne-gig.

government's attempts to place them on the Lac de Flambeau reservation. D.C. Leach, a government agent, reported in 1863 that several bands of Chippewa refused to move to the Lac de Flambeau reservation. Exxon, App. at 754. In 1879, the Post Lake Band's council sent a letter to the Commissioner for Indian Affairs, stating:

> We do not want to move to the Lake Flambeau reservation to which we were apportioned by the treaty of 1854, as this is no agricultural land, but mostly pine, which is coveted now by whites, and it will be only a short time before we will be obliged to sell out then.

Exxon, App. at 1455–56. In fact, there was only one instance in which the Post Lake Chippewa even offered to relocate to the reservation, and that was conditioned upon receiving substantial government aid. Exxon, App. at 1346–47.[6]

At the same time, the Post Lake Band was demanding a reservation of its own. In 1869, Chiefs Me-gee-see and Ne-gig wrote to the Commissioner of Indian Affairs, stating that they had been induced to sign the 1854 Treaty by promises that they "were not signing away our homes, but that we would have a reservation in the vicinity of Post Lake, where we could fish, gather Rice and make sugar." Exxon, App. at 1387–88.[7] There are other letters in the record where the Post Lake Chippewa implored the government to set out metes and bounds of the land that was promised to them under the 1854 Treaty. Exxon, App. at 1311, 1452.

From this history evolved the saga of a "lost reservation" which had been promised to the Post Lake Chippewa by the government, and a "lost map" that had set forth the metes and bounds of the reservation. Although there are many different versions of this history, they all have a common thread—the Post Lake Chippewa deny

signing away their rights of occupancy in 1854 in the land ceded by the 1842 Treaty without indications that they would receive some consideration in the form of land. Some versions state that Chief Me-gee-see was not present at the 1854 Treaty negotiations; others state that his approval of the treaty was contingent upon promises of a reservation for his people that he received from government agents. The Sokaogon believe that an agent met with Chief Me-gee-see within fifteen years after the ratification of the 1854 Treaty and negotiated a reservation for the Post Lake Chippewa. The reservation was set out on a map and a copy was made. En route to Washington, D.C. with a copy of the map, the agent perished in a shipwreck on Lake Michigan and the map disappeared with him. The Chippewa had given the other map to a trader named William Johnson for safekeeping. Johnson either stole it, refused to return it or held it as security for some unknown debts. Apparently, another white trader stole the map from Johnson and demanded money from the Post Lake Band for its return. They did not pay the ransom, for they were convinced that the other copy was safe in Washington, D.C. In any case, there is no tangible document today, but many Sokaogon still believe that this map existed and entitles them to a reservation encompassing the entire subject territory. See Exxon's Findings of Fact ¶¶ 84–147 and references therein.

Beginning in the late 1880's, the government began dividing up the Wisconsin reservations into 80 acre allotments, in accordance with the 1854 Treaty. When the Post Lake Bands went up to Lac de Flambeau to receive their allotments, they were turned away by Chief May-diva ah sung of the Lac de Flambeau Band. Exxon, App. at 1859. Other government documents indicate that the Lac de Flambeau tribes believed that the Rice Lake Chippewa (or the Chippewas living near Crandon) be-

---

6. The government refused to give the Chippewa any additional benefits aside from those enumerated in the 1854 Treaty, so the Post Lake Band did not settle on a reservation at this time.

7. Apparently, the authors of the letter were concerned that the government would not honor this alleged promise. The Chiefs noted that "[i]f this provision is not inserted in the treaty, it was doubledealing in the Commissioner, and we hope that the magnanimous government of the United States will not stoop to take such an ignoble advantage of us ignorant Indians."

longed to the L'Anse band in Michigan. Exxon, App. at 1534–1552. Whatever the reason the Post Lake Band did not relocate to the Lac de Flambeau reservation, it is clear that they owned no land at the turn of the century.

Until 1934, the members of the Post Lake Band had no designated place of residence. Some of them were assimilated into other tribes through marriage and lived on reservations in Wisconsin and Michigan. Exxon, App. at 1642–44, 1688, 1699–1704, 1804–05, 1811. Others crowded onto small tracts of land that had been bought by individual members of the tribe. *Id.* at 1692, 1858–59. Still others became squatters, living in abandoned lumber camps and other desolate areas. *Id.* at 1613–14. These Native Americans were forced to move whenever white settlers came along to claim the land.[8] They invariably left quietly and quickly and moved on to find another deserted piece of land.

In 1934, the Indian Reorganization Act authorized the Secretary of the Interior to purchase new lands and turn them into Indian reservations. 25 U.S.C. § 465, 467. The Sokaogon received 1,437 acres in 1939 and additional land in 1982. 4 Fed.Reg. 3431–32 (Exxon, App. at 178–79); 47 Fed. Reg. 17337–38 (Exxon, App. at 180–81); 48 Fed.Reg. 343 (Exxon, App. at 182). This is the area known today as the Mole Lake Reservation, which is adjacent to the western edge of the subject territory.

Prior to the mid–1970's, the Sokaogon continued to use the land within the subject territory consistent with the "usual privileges of occupancy." They would harvest berries in the summer, gather wild rice,

hunt and fish. They also conducted tribal rituals near Post Lake.[9] Affidavit of Fred Ackley, Jr. (Exxon, App. at 25–28).

B. EXXON'S MINERAL RIGHTS

Exxon's predecessors began to acquire their mineral rights to lands in the subject territory in 1850[10] through a series of statutes. One statute was enacted "for the purpose of aiding in the construction of a railroad," 11 Stat. 20 § 1, and another "to aid in the construction of a military wagon-road." 12 Stat. 797, § 1 (Exxon, App. at 138, 142). The remainder of Exxon's property had been sold initially to private settlers by the United States or the State of Wisconsin under Homestead Acts. Exxon, App. at 131–32, 140–41. All but two of the ninety-three land parcels in question have been privately owned since 1884.

Exxon's present interests in publicly-owned land extend to certain subsurface rights under roads owned by the Town of Nashville and an option to buy 880 acres of land from Forest County. Exxon has exercised this option, but as of November 12, 1991, there had been no closing on the land. The Sokaogon currently have the right to exercise their usufructuary privileges upon this land, but these privileges will presumably cease once the land becomes privately-owned. *See e.g., Lac Courte Oreilles Band v. State of Wisconsin,* 775 F.Supp. 321 (W.D.Wis.1991) (final judgment).

Exxon purchased its interests in the subject territory in connection with its "Crandon Project," a mine expected to yield tons of zinc, copper, and lead ore. Exxon, App. at 563. While the focus of the project is on

---

8. Willard Ackley, who was once Chief of the Sokaogon, testified in 1948 that he lived in a wigwam when he was a boy, but then "white man, he buy land, white man says 'my land,' we move out, we move a little ways, maybe we make wigwam again, and that is the way we kept on all the time, many years, long time." Exxon App. at 1998.

9. The Sokaogon have alleged that the land within the subject territory, but outside the bounds of their reservation, holds religious and historic significance for them. Apparently, there are ancient burial sites on the shores of Post Lake. However, Exxon has argued that these historic sites are outside the Crandon Project's bound-

aries, and some fall completely outside the subject territory.

10. It is not necessary to trace Exxon's chain of title back to the original purchasers of the land. Exxon has submitted records of recorded deeds in Exhibit A of its motion for summary judgment, and the Sokaogon have not contested the accuracy of the deeds. Since recorded deeds are *prima facie* evidence of good title, *Riha v. Pelnar,* 86 Wis. 408, 412–13, 57 N.W. 51 (1893), Exxon shall be regarded as owning the rights it asserts in each of the parcels of land in Exhibit A.

the minerals lying under the earth's surface, a substantial mining operation like the Crandon Project requires surface development as well. Exxon anticipates adding a mine-mill complex, a mine waste disposal facility, a rail spur, two roads, and a wastewater discharge pipeline to its property. Exxon's Findings of Fact ¶ 6. Although there has been a great deal of money invested in the project for exploration and development, no actual mining has begun. At present, Exxon claims that it is waiting for an economically opportune time to begin harvesting mineral deposits from this land. A favorable environmental impact statement was issued by the Wisconsin Department of Natural Resources in 1986. Exxon, App. at 556–594. Therefore, Exxon is prepared to begin mining once the economic conditions warrant a more significant investment. Affidavit of Fred Ackley, Jr. (Exxon, App. at 25–28). Sometime in the mid–1970's, Exxon's land within the subject territory was fenced, which curtailed the Sokaogon from carrying out their activities on the land. In 1986, the tribe filed its first complaint and embarked on the tortuous path which has led to today's decision.

## II. PROCEDURAL HISTORY

The Sokaogon set forth its original causes of action in a complaint filed on June 6, 1986 in the Eastern District of Wisconsin. It named as defendants the United States of America, the State of Wisconsin, Forest County, Langlade County, and Oneida County. The defendants answered the complaint, and the United States of America moved to dismiss the charges against it on September 3, 1986. Shortly thereafter, the plaintiff moved to amend its complaint to include as defendants others with interests in the subject territory. Exxon was among these additional defendants.

The United States' motion to dismiss was granted as to the original complaint. The plaintiff's request to amend its complaint was denied, but it was given leave to file a second amended complaint and did so on January 23, 1987. The second amended complaint also included Exxon as a defendant, as well as the United States. Once

again, the United States filed a motion to dismiss for lack of subject matter jurisdiction, which was denied without prejudice. At this juncture, the judge presiding over this matter recused himself, and the case was randomly reassigned to this Court.

The United States filed a motion for reconsideration of its motion to dismiss. This Court found that the plaintiff was time-barred from pursuing its complaint against the government under section 70K of the Indian Claims Commission Act (25 U.S.C. §§ 70–70n), 28 U.S.C. § 2401(a), and the Quiet Title Act (28 U.S.C. § 2409a(f)). The statutory waiver of its sovereign immunity was ineffective, and consequently, this Court lacked jurisdiction over the United States. After determining that the United States was an "indispensable party" to the litigation under Fed.R.Civ.P. 19(b), this Court found that it did not have jurisdiction over the remainder of the complaint. Furthermore, it held that to continue the action in the absence of the United States would be contrary to equity and good conscience. For these reasons, this Court *sua sponte* dismissed the entire complaint on August 9, 1988.

The plaintiff appealed to the Seventh Circuit, which held that even though the dismissal of the United States as a defendant was proper, the case could proceed in its absence. On July 24, 1990, the case was remanded back to this Court with instructions to proceed in the absence of the United States as a defendant.

After engaging in extensive discovery, the State of Wisconsin and Exxon have filed motions for summary judgment based on substantive and procedural arguments. Once the motions were fully briefed, this Court reviewed them and concluded that oral argument could clarify the issues presented. The parties presented their oral arguments on November 12, 1991, and this matter is now ripe for summary judgment review.

## III. LEGAL FRAMEWORK

### A. SUMMARY JUDGMENT

The standard for summary judgment. was set forth by the Seventh Circuit in *Howland v. Kilquist,* 833 F.2d 639 (1987).

Fed.R.Civ.P. 56(c) provides that a district court shall grant summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), or upon conclusory statements in affidavits. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986) ... The mere existence of a factual dispute will not bar summary judgment unless 'the disputed fact is outcome determinative under governing law.' *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983) *(en banc)*.

*Id.* at 642.

■ The United States Supreme Court further clarified the scope of Fed.R.Civ.P. 56 in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex*, the Court held that the initial burden is on the moving party to demonstrate "with or without affidavits" the absence of genuine issues of material fact and that judgment should be granted as a matter of law in the moving party's favor. *Id.*, 477 U.S. at 323, 106 S.Ct. at 2552. Once the moving party has met its burden, the opposing party must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

■ In *Anderson*, the Court stated that the presence of a genuine issue of fact is to be determined by the substantive law controlling that case or that issue. *Id.*, 477 U.S. at 252, 106 S.Ct. at 2512. The Court added that for purposes of Rule 56, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. The evidence must be evaluated in the light most favorable to the nonmovant in that all justifiable or reasonable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. However, a court need not draw every inference in the non-moving party's favor unless there are facts presented which reasonably support these inferences. *LCO I,* 700 F.2d at 349.

**B. NATIVE AMERICAN LAW**

■ Because Native Americans were put at a disadvantage in their negotiations with the government, their treaties should be interpreted liberally to compensate for their lack of bargaining power. *See e.g., Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); *Choctaw Nation v. United States,* 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *United States v. Shoshone Tribe,* 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). In *Worcester v. Georgia,* the Supreme Court held that treaties with Native Americans must be construed as the Native Americans understood them at the time. *Worcester,* 31 U.S. (6 Pet.) 515, 528, 8 L.Ed. 483 (1832). This general rule was refined and expanded throughout the nineteenth and twentieth centuries as Native Americans ceded more and more of their land to the government, which in turn gave or sold it to white settlers. For instance, in *Choctaw Nation v. United States,* 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886), the Supreme Court noted the disparity of bargaining power between the government and the Indians. *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899) reminds courts that Native Americans relied upon government-employed translators to inform them of the conditions of the treaties and were not familiar with the white man's legal system.

■ This is not to say that nonexistent rights should be read into treaties when it is clear that no such rights were intended. Treaties and Congressional acts involving Native Americans are meant to be construed to effect the purposes for which they were executed or enacted. "The underlying premise is that Congressional intent will control." *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977), citing *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975). A court may look to the words of the treaties and the surrounding circumstances in determining the government's intent. *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). If ambiguities exist in the wording of the treaties, they are to be resolved in the Native Americans' favor, but this "general rule does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary." *Rosebud Sioux Tribe*, 430 U.S. at 587, 97 S.Ct. at 1363.

■ Once Native Americans have treaty-recognized title, it cannot be extinguished by the United States unless compensation is paid. *LCO I*, 700 F.2d at 352. "[A]brogation of treaty-recognized title requires an explicit statement by Congress or, at least, it must be clear from the circumstances and legislative history surrounding a Congressional act." *Id.*, citing *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). In *LCO I*, the law was extended to apply to treaty-recognized rights. Because destruction of treaty-recognized rights would also subject the United States to a claim for compensation, *Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968), the Seventh Circuit concluded that extinguishing these rights necessitated the same clear showing of Congressional intent that is used for disputes involving treaty-recognized title. *LCO I*, 700 F.2d at 354 (treaty-recognized rights may not be extinguished by implication).

## C. THE LCO CASES

The Western District of Wisconsin, in a series of cases ("the *LCO* cases") beginning with *United States v. Bouchard*, 464 F.Supp. 1316 (1978) and becoming final in March, 1991 with *Lac Courte Oreilles Band, et al. v. State of Wisconsin, et al.*, 775 F.Supp. 321 (W.D.Wis.1991), determined the modern-day usufructuary rights of the descendants of the Lake Superior Chippewa. The Sokaogon joined as plaintiffs in 1983, after the matter was remanded to the district court for the second time in *LCO II*. State of Wisconsin's Brief in Support of Summary Judgment at 5. The resulting law and dicta from this string of cases is instructive, and in some situations, controlling.

In *Bouchard*, the court was confronted with three separate complaints requesting essentially the same relief—a declaration of the Lac Courte Oreilles ("LCO") Band's rights to hunt, fish and harvest on lands that had been ceded by the treaties of 1842 and 1854. In the portion of the ruling that dealt with the LCO Band's claim to hunting and fishing rights, the court found that the band's "usual privileges of occupancy" reserved in the 1842 Treaty had been extinguished on lands other than those reserved specifically under the 1854 Treaty. Because the Chippewa had explicitly retained these rights in earlier treaties, the court found the silence of the 1854 Treaty significant. It concluded that the Chippewa had ceded nearly all of their rights of permissive occupation that had been reserved in earlier treaties and the usufructuary privileges which accompanied these rights. The only properties on which these rights could be exercised after 1854 were the reservations named in the treaty.

The Seventh Circuit reversed the portion of the lower court's decision pertaining to the tribes' usufructuary rights. *Lac Courte Oreilles Band, etc. v. Voigt ("LCO I")*, 700 F.2d 341 (7th Cir.1983). First, the Court concluded that the 1842 Treaty gave the Chippewa the rights of use for a period of time that would be determined by their behavior. If they harassed white settlers, they would lose their rights to the land.

However, if there was no breach of the treaty, the government could extinguish the Chippewa's usufructuary rights only by compensating them, since that would have been a taking under the Fifth Amendment. Because the rights were treaty-recognized rights, a Congressional act would "be construed as extinguishing [them] only if the legislation expressly stated that such was the intent of Congress or if the legislative history and surrounding circumstances made clear that abrogation of treaty-recognized rights was intended by Congress." *LCO I*, 700 F.2d at 358.

Next, the Seventh Circuit concurred with the lower court's finding that the Chippewa's usufructuary rights were not affected by the Removal Order of 1850, since there was never a showing that the Chippewa had harassed any white settlers. The Removal Order was also invalid; President Taylor did not have the power to enforce it because it exceeded the scope of both of the earlier treaties. *Id.* at 362. Therefore, in 1851, the Chippewa still retained their treaty-recognized rights of occupancy reserved by the 1842 Treaty.

In its discussion of the 1854 Treaty's impact on modern tribes, however, the Seventh Circuit noted that there was no express statement in the 1854 Treaty extinguishing the usual privileges of occupancy. Instead, "the Chippewas believed that they had been promised the right to remain on and use the ceded land unless they misbehaved." *Id.* at 364. Further examination revealed that there was no clear Congressional intent to extinguish the privileges. The Chippewa had entered into two earlier treaties in which their usufructuary rights were specifically reserved. Since the Chippewa probably construed the 1854 Treaty as the same type of treaty, the Seventh Circuit found that they had every reason to believe they retained the usual rights. Therefore, the 1854 Treaty could at most *imply* that the Chippewa's rights were abrogated. Since "treaty-recognized rights [could not] ... be abrogated by implica-

tion," *id.* at 365, the LCO Band continued to retain their rights.

In remanding the matter back to the Western District of Wisconsin, the Seventh Circuit assumed that the LCO Band's argument could not be extended to lands that were privately owned. Although *LCO I* did not set forth any direct guidance as to the Chippewa's usufructuary rights on privately owned land, the Court opined that the LCO Band's claim would be inconsistent with evidence showing their knowledge that the land would eventually be used for white settlement. *LCO I*, 700 F.2d at 365, n. 14.

On remand, the district court ruled in part that any usufructuary rights that continued to exist were limited to "those portions of the ceded lands that were not privately owned as of March 8, 1983." [11] *Lac Courte Oreilles Band. v. State of Wisconsin ("LCO II")*, 760 F.2d 177, 179 (7th Cir.1985). The judge's literal interpretation of *LCO I* was criticized upon appellate review. Apparently, the Seventh Circuit had never meant to lock in the LCO Band's right to their land use to a designated time. It had found that the land was ceded in 1854 for the eventual purposes of settlement. Although the publicly-owned lands had not been settled as of March 8, 1983, there was no guarantee that they would never be settled. Therefore, the LCO Band's right to the land was not a perpetual right. It could be extinguished when the land became "privately owned." *Id.* at 182.

*LCO II* then clarified *LCO I*'s discussion of "privately-owned" land. The State of Wisconsin had suggested that once land was privately owned, it should keep that status as per the LCO Band's usufructuary rights, even if it had been bought back by a public entity. The Seventh Circuit repudiated this contention and stated that usufructuary rights could not be "laundered out" of publicly owned land by a mere "passing through." *Id.* In Wisconsin, there are parcels of privately-owned land

---

11. March 8, 1983 was the date on which the Seventh Circuit's decision in *LCO I* became binding.

upon which non-Indians may hunt or fish. The Seventh Circuit realized it would be unfair to exclude the Chippewa from this land when others with no treaty-protected rights could freely exercise the same type of privileges. It also recognized problems which might arise if claims were made on "quasi-public" lands, such as those properties on which schools, hospitals or highways were located. However, the Court did not provide specific guidance for these situations, and suggested that a district court should engage in a detailed factual examination in such cases. *Id.*[12]

In its third opinion in this matter, the district court expressed its discomfiture with the Seventh Circuit's factual finding that the Chippewa had understood that white settlement would extinguish their usufructuary rights. However, bound by the higher court's decision, it concluded that the Chippewa should at least be able to "enjoy a moderate living" by exercising their reserved rights on the ceded land, regardless of the land's ownership. *Lac Courte Oreilles Chippewa Ind. v. State of Wisconsin*, 653 F.Supp. 1420, 1432 (W.D.Wis.1987). Therefore, if the Chippewa could not enjoy a modest living off publicly owned land as a result of a diminution in their usufructuary rights, "appropriate measures must be taken for Chippewa activity on privately owned land to permit the Chippewa to enjoy a modest living." *Id.*

The final judgment in this string of cases was entered by Chief Judge Crabb on March 19, 1991. *Lac Courte Oreilles Band v. State of Wisconsin*, 775 F.Supp. 321 (W.D.Wis.1991). While the Native Americans retained their rights to hunt, fish and gather with minimal state regulation, the court clearly limited these activities to lands either owned by public entities or privately-owned lands which were "enrolled in the forest cropland or open managed forest lands program under Wis.Stat. ch. 77 at the time of the contemplated or actual attempted exercise of such rights." *Id.* at 323–24. The Sokaogon tribe and its members are bound by this judgment. *Id.* at 325.

The focus of the *LCO* decisions was on usufructuary privileges rather than the right to possess and occupy land, and the Seventh Circuit bifurcated the general right of occupancy into these two components in *LCO I*, 700 F.2d 341. There is a limited right to occupy land implicit in the exercise of usufructuary activities since the right to harvest or hunt is meaningless if a person cannot be physically present upon land. In the present action, the Sokaogon have asserted that they are entitled to more than a limited right of permissive occupation. Although the extent to which they wish to occupy and possess the land has not been made clear to this Court[13], it is apparent that they wish to assert more control over the subject territory than they do at present.

## IV. DISCUSSION

### A. EXXON'S ARGUMENTS

In a voluminous motion for summary judgment, Exxon has set forth various de-

---

**12.** This Court views the Seventh Circuit's ruling as authorization for district courts to create exceptions to the general rule for public policy reasons. For example, the *LCO II* court expressed concern that a cartel of private landowners would be able to eradicate all of the Chippewa's usufructuary privileges simply by buying publicly owned land and then reconveying it back to the state. By creating this loophole in allowing privileges to be exercised on privately-owned land, the Seventh Circuit empowered district courts to achieve results based upon fairness rather than strict property law. Through this language, the Chippewa are not entitled to exercise their usufructuary activities on privately owned land to the extent that they could not sustain a "modest standard of living"

using just publicly-owned lands. *Lac Courte Oreilles Band v. State of Wisconsin*, 775 F.Supp. 321 (W.D.Wis.1991) (final order).

**13.** During oral arguments, Sokaogon's counsel described these rights as ranging from the right to erect temporary homes and live on the land for periods of time to the right to stand on the land and view it as one's own. In their brief in response to the State of Wisconsin's motion for summary judgment, the Sokaogan listed the following activities included in the right to possess and occupy: "the right to camp for whole seasons, the right to erect homes, to process one's harvest, to bury one's dead and conduct communal and religious rituals." Response at 9.

fenses to the Sokaogon's claims. First, it states that the privileges of occupancy reserved by the 1842 Treaty never extended to Exxon's surface or mineral interests within the subject territory, because that land will be used for mining or for activities associated with mining. In addition, Exxon argues that the "usual privileges of occupancy" do not extend to land that is privately owned. Exxon further asserts that any rights in the land that the Chippewa retained after 1842 were relinquished in the 1854 Treaty.

In its second argument, Exxon points to the fact that the United States had never made the subject territory into a reservation or even treated it like one. The 1854 Treaty did not, by its explicit language, reserve a discrete portion of land for the Post Lake Band. The tenor of communications sent to Washington D.C. by agents in Wisconsin indicated that the Chippewa living in the Post Lake and Rice Lake area were one of the "lost tribes" without a reservation of their own. Although the Sokaogon have claimed that they were promised a reservation by their "lost reservation" and "lost map" arguments, Exxon points to the factual discrepancies contained in the record which show that this claim is not historically consistent. Furthermore, even if the Sokaogon were entitled at one time to retain these privileges, Exxon contends that they must be precluded now because of their failure to bring their claims in a timely fashion.

Exxon has also put forth several procedural bases for dismissal pursuant to Federal Rule of Civil Procedure 19. First, it claims that the United States is the only party against whom the Sokaogon have a claim for relief and that Rule 19 also prohibits an adverse judgment against Exxon when there are numerous other third parties with interests in the subject territory who have not been joined as defendants in this matter.

## B. STATE OF WISCONSIN'S ARGUMENTS [14]

■ The State of Wisconsin has moved for summary judgment on several additional grounds. First, it argues that the Chippewa's privileges of occupancy in the land ceded by the 1842 Treaty were extinguished when the United States issued patents for the land to "non-Indian settlers." Since the land was once privately owned, the rights that were terminated when the land was originally conveyed to the settlers should remain terminated even if the state subsequently receives title from a private entity. Wisconsin also claims that it is immune from suit under the Eleventh Amendment, which precludes a party from bringing an action against a state in federal court unless that state has consented to the court's jurisdiction.[15]

## C. THE SOKAOGON'S REBUTTAL

In addition to responding to most of the defendants' specific arguments in support of summary judgment, the Sokaogon have claimed that the nature of the evidence relied upon by Exxon necessitates a trial. Most of the Lake Superior Chippewa could not speak or read English, and yet the record is replete with statements attributed to various Native Americans. The Sokaogon suggest that these interpretations are tainted and should be subject to cross-cultural analysis by an ethno-historian.

First, the Sokaogon point out that many interpreters were presumably "interested

**14.** The State of Wisconsin, at the outset of its brief in support of summary judgment, has set forth reasons encouraging this Court to disregard parts of the *LCO* rulings. However, this Court must follow the decisions of the Seventh Circuit unless it is "powerfully convinced that [the Seventh Circuit] would overrule [its previous holding] at the first opportunity." *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987). Wisconsin has claimed that a court should not divide privileges of occupancy into habitational and non-habitational components and that removal under the 1842 Treaty was conditioned upon settlement rather than misbehavior. These arguments are directly contrary to the holdings in *LCO I* and *II*, and the Court will not address them further, since they are not supported by law.

**15.** The defendant counties have not filed a separate brief; however, some of the defenses raised by Exxon and the State of Wisconsin are applicable to all the defendants, such as whether the 1854 Treaty terminated the privileges of occupancy reserved by the 1842 Treaty.

parties," such as traders to whom the Native Americans may have owed money. Next, even if the interpreter was unbiased, the fact remains that there was a cultural gap between the Chippewa and the government agents, and certain nuances and implications may have been lost in the translation. Exxon's use of the documents is criticized, and the Sokaogon have incorporated expert testimony from one of the *LCO* cases in its response to illustrate the different meanings various interpretations may give to the "unambiguous" words of a petition or a letter.

The Sokaogon have cited to several cases where summary judgment was denied based upon the need for expert testimony at trial. *Technograph Printed Circuits v. Methode Electronics, Inc.*, 356 F.2d 442 (7th Cir.1966); *Sonobond Corp. v. Uthe Technology*, 314 F.Supp. 878 (N.D.Cal. 1970). Since Exxon has not shown that it has relied on an expert in its interpretation of the ancient documents in the record, the Sokaogon claim that it has not met its burden under the summary judgment standard.

### D. MATTERS NO LONGER IN DISPUTE

In its response brief, the Sokaogon have conceded that some of the issues raised in the complaint have been resolved conclusively and on the merits. Exxon has suggested that this Court enter judgment in its favor to prevent the possibility of future litigation about these matters.[16] This Court shall examine the facts presented and determine whether Exxon has shown that there are no genuine issues of material fact that would necessitate a trial.

(1). The Treaty of 1854 Did Not Provide The Sokaogon With a Reservation of Their Own, Nor Was It Intended to do so

▉ Count Two of the Second Amended Complaint alleged that the government had mapped out and delineated a reservation for the Post Lake Band by 1860, and that dispossession of this land deprived the Sokaogon of the rights and property guaranteed by the 1854 Treaty. The Sokaogon did not dispute the fact that the 1854 Treaty only provides for three reservations in Wisconsin, none of which were granted exclusively to the Post Lake Band. Instead, they claimed that the government induced the Post Lake chiefs to sign the 1854 Treaty by promising them a separate reservation of their own. The subsequent actions of government officials, the Sokaogon added, are in accord with this promise.

Thus the "lost reservation" and "lost map" claims arose. Exxon has acknowledged that these claims are a part of the Sokaogon's lore and are made in good faith; however, it states that the claims are completely contradicted by the actions and intent of United States policymakers at the time the promises were allegedly made and has moved for summary judgment on this claim. Pointing out all the inconsistencies surrounding legends of a "lost reservation" or "lost map," Exxon argues that the Sokaogon's allegations are supported by "a self-contradictory jumble of hearsay, speculation, and conjecture, ... [which] collapse[s] when analyzed against the historical record." Exxon's Brief at 44.

▉ First, Exxon notes that the 1854 Treaty did not, on its face, provide a reservation for the Post Lake Band. One reservation was clearly set aside along Lake Superior for the La Pointe Band and "such other Indians as may see fit to settle with them." 1854 Treaty, Art. II, § 2. The plain terms of the treaty call for "the other Wisconsin bands" to live on tracts of land set aside near Lac de Flambeau and Lac Courte Oreilles. *Id.* at § 3. There are no ambiguities in the treaty's language that could be construed in favor of the Sokaogon. Furthermore, the alleged promises made by the Commissioner of Indian Affairs, George Manypenny, to Chiefs Megee-see and Ne-gig to induce them to sign the treaty should not be accorded great weight, since the 1854 Treaty was executed by two different Indian agents, and Commissioner Manypenny was in Washington, D.C. during the summer of 1854. Finally,

---

**16.** In 1940, this claim was presented to the Court of Claims, but was abandoned in 1953 without any conclusive determination. *See* Exxon's Reply Brief, 29 n. 2, and citations therein.

even if the Post Lake Band received promises of a reservation, no such promises were clear from the terms of the 1854 Treaty; thus Exxon cannot be subject to these promises.[17]

 In addition, Exxon argues that the actions of the United States cannot be construed as setting aside a separate reservation for the Sokaogon. While acknowledging the limited existence of *de facto* reservations, *Spalding v. Chandler*, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469 (1896), Exxon has pointed out that the Sokaogon must show "that from what has been done there results a certain defined tract appropriated to certain purposes." *Minnesota v. Hitchcock*, 185 U.S. 373, 390, 22 S.Ct. 650, 657, 46 L.Ed. 954 (1902). The United States must have "affirmatively intend[ed]" to treat the tract as a reservation, *Strong v. United States*, 518 F.2d 556, 563, 207 Ct.Cl. 254 (1975), and must have "approved" the treatment of the land as a reservation. *Northern Pacific Ry. Co. v. Wismer*, 246 U.S. 283, 288, 38 S.Ct. 240, 242, 62 L.Ed. 716 (1918). The government authority establishing a *de facto* reservation must be competent,[18] and the boundaries of such a reservation must be defined precisely by writing "or by long continued and consented to occupation within well understood contours." *Bouchard*, 464 F.Supp. at 1354.

Exxon has claimed that the Sokaogon have failed to show that the United States has treated the subject territory as a reservation. First, the Sokaogon's claim is contradicted by government policy during the latter half of the nineteenth century. The purposes behind the 1854 Treaty were to open up the interior of Wisconsin for settlement and mining and to "civilize" the Native Americans occupying this land. Although initially, the government intended to situate all the tribes in Northern Wisconsin along the shores of Lake Superior, it finally compromised with the Chippewa and created two interior reservations in response to the demands of the tribes living there. The easiest way for the government to accomplish its goals was to concentrate the Native American population into these relatively small reservations. This would facilitate agents' contact with the tribes, and at the same time reserve the bulk of land in Wisconsin for settlers and miners. In addition, there is evidence that Indian agents tried to convince the interior tribes to relocate to La Pointe and "colonize" with the other Chippewa along Lake Superior. Exxon contends that any arguments by the Sokaogon concerning negotiations for an interior reservation at that point in time are implausible based upon the government's conduct and clear intentions.

Furthermore, Exxon has set forth evidence showing that Indian agents would not have promised the Post Lake Band a separate reservation, since many agents believed the tribe belonged on an established reservation. In any case, no one with authority ever approved the Post Lake Band's numerous requests for a reservation. In fact, these requests were rejected expressly at least twice. Exxon's Brief at 70–71. The government never took any steps in recognizing the subject territory as a reservation, such as providing a blacksmith or teachers. Leaders of the Post Lake Band often commented that the government had never set aside a reservation for them.

Finally, Exxon has demonstrated that not even the Sokaogon have presented a consistent set of facts and pleadings. The alleged reservation has never been defined by static boundaries. The size and location of the disputed territory has not remained constant over the years, and there have been times when the "lost reservation" did

---

17. If the Sokaogon could have proven that they signed the treaty in reliance on promises made by government agents and those promises were not carried out, they might have had a "moral" claim against the United States. *Indians of California v. United States*, 98 Ct.Cl. 583, 599 (1942). However, they may not pursue this against Exxon.

18. Indian Office employees and field agents are not competent to establish reservations without approval from a person with authority. *Northern Pacific Railway Co. v. Mitchell*, 208 F. 469, 472 (D.Wash.1913).

not include any of Exxon's land.[19] Throughout this case's history, the plaintiff's claims have changed as well. In the original complaint, which did not name Exxon as a defendant, the Sokaogon claimed that they had been promised a reservation, but that one had never been surveyed, nor had boundaries ever been established. Complaint at ¶ 11. The Second Amended Complaint alleged that the reservation "was delimited and mapped by federal officials by the year 1860." Second Amended Complaint at ¶ 24. Because of these inconsistencies and lack of factual support for the Sokaogon's claims, Exxon has moved for summary judgment dismissing the entire portion of Count II.

The Court finds that the Post Lake Band was characterized by Indian agents as a "lost tribe," "stragglers," or "squatters," indicating that the Sokaogon were viewed as trespassers on the lands they occupied, even though they may have claimed this land as their reservation. They never formally received a reservation, nor have they been able to show that one was set aside for them. The clear words of the 1854 Treaty, as well as its intended purpose, have convinced the Court that the only reservations that the government meant to establish were the ones named in the treaty itself. The Sokaogon have not attempted to rebut the evidence put forth by Exxon and have conceded that they no longer have a cause of action on this count. From the undisputed facts presented, the Court finds that the 1854 Treaty did not confer any rights to a reservation upon the Sokaogon and enters summary judgment in favor of the defendants on Count II of the Second Amended Complaint.

(2). The Sokaogon Have a Limited, But Protectible, Interest in Harvesting Minerals Consistent With Their Usufructuary Privileges Defined in the LCO Litigation

 Exxon has also asked the Court to find that the Chippewa did not retain any mineral rights under the 1842 Treaty. It

claims that the Sokaogon initially asserted that its occupancy rights encompassed the mineral estate under the land, and then later denied these assertions. However, in reading the statements that Exxon has attributed to the Sokaogon, this Court finds that the plaintiffs' claims have been consistent. The "usual privileges of occupancy" retained by the Post Lake Band included mineral rights as long as the Band was making use of those minerals at the time of the treaty. There is some evidence that copper would occasionally be used in religious ceremonies. Although the Post Lake Band was clearly not engaged in extensive commercial mining operations, it is uncontroverted that surface minerals played a part, however minimal, in the tribe's activities.

Contrary to Exxon's assertions, the Sokaogon's answers to interrogatories are consistent with this definition of the "usual privileges of occupancy." In 1987, the Sokaogon claimed an interest in minerals "that were in use or trade amongst the Chippewa before or at the time of the treaty." Exxon's App. at 23. Apparently, these were the minerals that had risen to the surface and were picked up and used by the Chippewa. In another set of interrogatories, the Sokaogon asserted:

> a right of use of minerals, consistent with the needs of occupancy and its traditional usages. To the extent a reservation was or should have been established under the 1854 treaty, it would have vested in the plaintiff beneficial title to the full mineral estate in the twelve mile square area.

Exxon, App. at 74. Although the Sokaogon's asserted interest in minerals is negligible compared to Exxon's, the Court cannot dismiss their rights merely because they were not actively mining and selling copper. Instead, if the Sokaogon's "usual privileges of occupancy" have survived the 1854 Treaty, then it must follow that they have retained whatever rights to the minerals that they had at the time the treaty was

---

**19.** In their original complaint, the Sokaogon described boundaries which did not include any

part of the Crandon Project.

signed.[20] For the purposes of this action, the Court will view the existing "usual privileges of occupancy" as including whatever use of surface copper the Chippewa may have exercised circa 1842.

## V. ANALYSIS

Having narrowed the issues considerably, Exxon claims that it is entitled to summary judgment on any of a number of grounds. The State of Wisconsin may be entitled to summary judgment on several of Exxon's grounds, and has set forth two additional grounds upon which summary judgment may be granted for it. The Court finds that summary judgment may be granted in favor of all the defendants on the grounds that the 1854 Treaty abrogated the Sokaogon's right to possess and occupy the subject territory. Alternative grounds upon which summary judgment may also have been granted for some or all of the defendants will also be addressed.[21]

### A. THE SOKAOGON'S RIGHT TO OCCUPY AND POSSESS THE SUBJECT TERRITORY

▮ At issue is whether the 1854 Treaty extinguished that portion of the Chippewa's "usual privileges of occupancy" that permitted them to "possess and occupy" the ceded land. This Court finds that those rights have indeed been extinguished and that summary judgment should be granted to all of the defendants.[22]

The Court is guided in its decision by the Seventh Circuit's analysis in *LCO I.* When

reviewing the district court's decision in *Bouchard,* the Court looked to the circumstances surrounding the 1854 Treaty to determine whether it was intended to abrogate the LCO Band's rights under the 1842 Treaty, since there was no direct guidance from the actual wording of the 1854 Treaty. *Id.* at 362. When this analysis is applied to the facts in the present case, it is apparent that there is a distinction between usufructuary privileges and the right to possess and occupy land under the 1854 Treaty.

In *LCO I,* the Seventh Circuit noted that "the Treaty of 1854 should be held to have abrogated these treaty-recognized rights only if the 1854 Treaty enactment expressly refers to termination of the usufructuary rights or if the circumstances and legislative history surrounding the treaty make clear that Congress intended such an abrogation." *Id.* at 362. The district court had originally concluded:

> that by the treaty of 1854, the Chippewa surrendered their rights of permissive occupation in the territory ceded in 1837 and 1842, except to the extent that portions of the territory so ceded were to become parts of the reservations provided for in the treaty of 1854.

*Bouchard,* 464 F.Supp. at 1352. However, the Seventh Circuit reversed this portion of the district court's order and held that the LCO Band's usufructuary rights were unaffected by the 1854 Treaty.[23]

**20.** This finding has virtually the same effect as if the Court had adopted Exxon's Conclusion of Law concerning mineral rights, since Exxon has shown that the Post Lake Band rarely took advantage of the subterranean ore body. However, the Court cannot deprive the Sokaogon of the use of minimal amounts of surface copper for religious ceremonies when this use is consistent with other rights reserved to them.

**21.** Since these motions may be resolved on the merits, the Court finds that it is unnecessary to address the defendants' procedural defenses, nor shall it address Exxon's less persuasive arguments. Furthermore, since it does not have jurisdiction over the State of Wisconsin, it will not consider the State's defense concerning the patenting of land.

**22.** This holding in no way affects the final judgment of the *LCO* case, which was limited to the

Native Americans' rights to fish, hunt, and gather. These usufructuary rights obviously encompass the right to be present upon the land to a certain degree. This Court merely finds that the Sokaogon's right to assert an interest in the land itself, rather than the fruits of the land, is inconsistent with the purposes behind the 1854 Treaty.

**23.** Although the district court's ruling pertained to both the right to possess and usufructuary privileges, the Seventh Circuit did not address the former. In a footnote, it remarked:

> The right to "occupy" the ceded lands is not before this court, unless one considers entering onto public lands to exercise usufructuary rights a limited kind of "occupancy." For purposes of these appeals, we will assume the correctness of Judge Doyle's conclusion that the Indians' right to occupy the ceded land was terminated by the Treaty of 1854 ...

In finding that the Chippewa's usufructuary rights survived the 1854 Treaty, the Seventh Circuit examined the nature of treaty-reserved rights. It noted that usufructuary rights "depend neither on title nor right of permanent occupancy; rather, they are similar to a *profit à prendre.*" *Id.* at 352, citing *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Although the Chippewa realized that they were relinquishing legal title to the land, it was possible that they did not intend to give up all of their treaty-recognized rights and privileges as well. For these reasons, the Seventh Circuit found that the LCO Band did not know that signing the 1854 Treaty would abrogate these usufructuary rights. It also concluded that the government did not clearly intend to extinguish these rights completely. *LCO I,* 700 F.2d at 364.

The Seventh Circuit cited four factors in support of its conclusion. First, while some Lake Superior Chippewa were practicing agricultural techniques used by the white settlers, the majority of Native Americans survived by hunting and gathering, not farming. There was no evidence that the Chippewa would adopt an agrarian lifestyle as soon as the treaty was ratified. In fact, the Chippewa continued to hunt and gather for years after the treaty's provisions were enacted, which the Seventh Circuit cited as its second factor. Third, the Chippewa believed that they were free to exercise their usufructuary privileges as long as they did not harass white settlers, and this belief was supported by the events occurring after the abortive 1850 Removal Order. Finally, the fact that the Minnesota Chippewa had received a reservation of usufructuary rights in the 1854 Treaty suggested that the Lake Superior Chippewa felt that their rights were protected as well. *LCO I,* 700 F.2d at 364.

 Usufructuary rights like hunting and fishing imply temporary presence and minimal physical occupation of the land. A

person may pass over another's land or use the fruits of that land without asserting any rights to the land. The products taken from the land through hunting, fishing, and harvesting are renewable and will be available on the land for an infinite time as long as those taking the products exercise a certain degree of restraint. Therefore, this Court agrees that the exercise of usufructuary activities is not contingent upon actual ownership of land, since the fee owner retains title and can reap the fruits of his land as well.

In contrast, there is a limited amount of land in the world, and in Wisconsin in the mid-1800's, it appeared to the Native Americans as if they would lose their privileges when others settled upon the land. The Chippewa, including Chief Me-gee-see, recognized that the mere right to occupy would not be sufficient as Wisconsin became more and more crowded with white settlers. In 1853, they sent a "memorial" to the Commissioner of Indian Affairs expressing their desire for reservations of land in order to preserve their nation. The Chippewa expressed their belief that this was the only way for them to acquire "a possession which shall be our own and may not be overflowed by the multitudes who come from your cities and towns to dwell in the forests." *Exxon,* App. at 1179. The letter also supports the conclusion that they understood that the right to possess and occupy was inconsistent with public and private settlement of land.

The 1842 Treaty did not direct the Chippewa to live in a particular area; rather, it reserved to them their usual privileges of occupancy in the ceded territory. In comparison, the 1854 Treaty specifically directed the Chippewa to live on three reservations in Wisconsin. Unlike the 1842 Treaty, no express rights were retained by the Chippewa under the 1854 Treaty except for this right to live in specific areas and presumably exercise their usual privileges of occupancy. The Seventh Circuit concluded in *LCO I* that the 1854 Treaty's silence as

*LCO I,* 700 F.2d at 362, n. 12. The plaintiffs never appealed the part of the court's ruling

concerning their occupancy rights on the land.

to usufructuary rights resulted in an implied reservation of these rights. There is no similar silence with regard to the Chippewa's right to possess and occupy. Rather, Article 2 of the treaty sets aside and "withhold[s] from sale, for the use of the Chippewas of Lake Superior" three tracts of land. Article 11 calls these lands "homes." Contemporaneous documents attributed both to the government and to the Chippewa clearly indicate that these reservations were meant to be homes for the Chippewa.

Moreover, complete termination of the right to possess and occupy land outside the reserved parcels is consistent with the dual purposes of the treaty—opening up new land for easier settlement and "civilizing" the Native Americans who previously lived on that land. Allowing the Chippewa to inhabit land outside of the reservations would not have served the government's ends. Although the Post Lake Band did not live on a reservation until 1939, they were constantly encouraged to relocate throughout the late 19th and early 20th century. They were not forced off the land, but neither were they granted the land they sought.

Therefore, the terms of the treaty and the circumstances surrounding the treaty, including the government's policies and the Chippewa's understanding, clearly support this Court's finding that the 1854 Treaty abrogated the occupancy rights which were reserved in the 1842 Treaty. Although the Chippewa still retained usufructuary rights on off-reservation lands, the rights to possess and occupy these lands were ceded in return for lands which were thereafter closed to white settlement.

The Sokaogon claim that the 1842 Treaty rights still survive. They have cited to *United States v. Thomas*, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894), in support of the contention that the Post Lake Band's right to occupy the ceded territory was still in existence at that time. They also argue that the analysis used in *Bouchard* cannot be applied in this case for two reasons. First, the fact that the Chippewa accepted permanent homes under the 1854 Treaty implies that they recognized that they were giving up occupancy rights in the ceded territory. Secondly, their occupancy rights were held to have terminated once they received the land promised in the treaty, not when the treaty was ratified.

As Exxon has pointed out in its Reply Brief, the Sokaogon's citation to *Thomas* has been taken completely out of context. In *Thomas*, the Supreme Court held that there was no change in the Chippewa's occupancy rights on land that had subsequently become part of a reservation under the 1854 Treaty. Although the treaty may have changed the nature and scope of the Chippewa's off-reservation rights, they still retained those privileges from the 1842 Treaty on their reservations. In contrast, this case concerns the Chippewa's occupancy rights on *non-reservation* land; thus the Supreme Court's holding in *Thomas* is not relevant.

The plaintiff has also attempted to distinguish the LCO Band's reservation history from its own. The LCO Band's reservation, which was at issue in *Bouchard*, did not have its boundaries established until well after the 1854 Treaty was ratified. The Sokaogon contend that they were still negotiating for their reservation well into the 1870's. The fact that they did not receive a reservation under the 1854 Treaty should invalidate the treaty's provisions, since they never benefitted from the bargain entered into with the government when they traded their occupancy rights for the 1854 Treaty reservations. Therefore, the Sokaogon have claimed that their occupancy rights were never terminated.

The term "negotiation" as used by the Sokaogon is ill-chosen. Negotiation implies bargaining in which two parties are willing to make concessions in order to reach a mutually agreeable outcome. The evidence presented by the Sokaogon and Exxon, even when taken in the light most favorable to the non-moving party, does not show that there were ongoing negotiations between the Post Lake Band and government agents. Rather, it proves that the Post Lake Band had hoped that they would be given a reservation apart from those

established under the 1854 Treaty. These wishes were expressed to various Indian agents and government officials, but no encouraging responses were ever received from anyone with the authority to negotiate for a reservation. The government never took any affirmative steps in creating a third interior reservation for the Sokaogon until the 1930's.

The Sokaogon were not able to refute Exxon's claim that the United States never established, or intended to establish, a separate reservation for them. Yet, by relying on this "negotiation" argument, they are asking this Court to take as true allegations Exxon has already shown to be speculative at best. The Sokaogon have admitted that they have no claim to a reservation on the subject territory under the 1854 Treaty. It follows that any negotiations or discussions in which the Post Lake Band engaged could not have resulted in a reservation. To accept the Sokaogon's argument would be to acknowledge that they should have the occupancy rights reserved by the 1842 Treaty until a reservation is established for them, even though they are not entitled to a reservation.

Furthermore, the Post Lake Band did receive a reservation under the 1854 Treaty, even though they were not specifically named as the recipients. Section 3 of Article 2 provides "[f]or the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Courte Oreilles, ... the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President." The Post Lake Band was a Wisconsin band and could have settled at either of those two reservations. The band's council even acknowledged that they were apportioned the Lac de Flambeau reservation under the 1854 Treaty, but did not wish to move there. *See supra* Exxon App. at 1455–56. Instead, the tribe chose to remain where it had lived in the past, hoping that they would receive a reservation at a future date.

The Sokaogon have argued that their acceptance of the Mole Lake Reservation in 1939 does not extinguish their claim to the 1842 privileges, and they are partially correct. This claim had already been extinguished years earlier.

Although the LCO Band lived on the Lac Courte Oreilles reservation, that reservation was not established solely for their benefit. The only tribe that received a designated reservation under the 1854 Treaty was the La Pointe Band. Even so, the La Pointe Band was required to share its reservation with "such other Indians as may see fit to settle with them." 1854 Treaty, Art. 2, § 2. The fact that one of the reservations had the same name as a Chippewa tribe does not conclusively establish that the reservation was formed for that tribe's exclusive benefit. The Sokaogon have not shown that the LCO Band received greater benefits under the 1854 Treaty than the Post Lake Band. Without evidence to the contrary, the Court must find that the 1854 Treaty granted to the Lake Superior Chippewa two parcels of land in Wisconsin's interior for their permanent homes and did not specify which bands were to live on which reservation. The LCO Band established itself at the reservation near Lac Courte Oreilles, and their occupancy rights were extinguished when the reservation's boundaries were set. Even though the Post Lake Band never relocated to any of the 1854 Treaty reservations, their occupancy rights must have been extinguished when the boundaries of the last unsurveyed reservation were finalized.

The Post Lake Band may have believed that they were entitled to a reservation, but this belief cannot override the words and circumstances surrounding the 1854 Treaty. The government's intent was all too clear, and the words of the treaty reflect this intention. Native Americans were to make their homes on the reservations in order to grant Indian agents easier access to them. They could leave the reservations to hunt, fish, or gather plants, but they were meant to return to their homes. The right to occupy off-reservation territory is wholly inconsistent with these goals. Therefore, the defendants' motions for summary judgment shall be granted.

## B. PRIVATELY-OWNED PROPERTY

██ Exxon has fee title or mineral or surface rights in ninety-one parcels of land in the subject territory, and has options to purchase land from Forest County and subterranean mineral rights from the Town of Nashville. These interests in land are vital to the success of the Crandon project. The orebody at the heart of the project is located under a small portion of Exxon's land, but adjoining lots were purchased for other activities associated with mining.

In the *LCO* litigation, both the Seventh Circuit and the Western District were absolutely clear as to the Chippewas' usufructuary rights on private property—they were completely extinguished. The Chippewa understood, at the time the treaties were signed, that the lands upon which they exercised their privileges would eventually be used for white settlement. In *LCO II*, the Seventh Circuit held that private lands were not intended to be subjected to the Chippewa's usufructuary rights, since "settlement" was found to be synonymous with "private ownership."

Because the Sokaogon may not hunt, fish, or harvest plants on privately owned property, it follows that they should not be able to occupy it as well.[24] Coming onto property and living there, however briefly, is more invasive than hunting or fishing on that property and suggests an ownership interest rather than a license or profit à prendre.

In the *LCO* litigation's final judgment, the district court reiterated the fact that the usufructuary rights of the plaintiff tribes, including the Sokaogon, were limited to lands that were not privately owned. *Lac Courte Oreilles Band v. State of Wisconsin*, 775 F.Supp. 321 (W.D.Wis.1991). The logical extension of this ruling would limit the Sokaogon from exercising any occupancy rights they may possess on privately owned land. Usufructuary activities can be accomplished through minimal and temporary physical presence on land. To occupy the land necessitates some sort of

action asserting ownership, such as the erection of a temporary home. It would be anomalous for this Court to find that the Sokaogon have the right to possess and occupy land upon which they may not hunt, fish or gather.

At the time the treaty was signed, the Chippewa understood that they retained their occupancy rights subject to white settlement. "Settlement," according to the Seventh Circuit, is synonymous with "privately owned land." *LCO II*, 760 F.2d at 182–83. The Sokaogon's predecessors knew that they would be required to remove from ceded lands once settlement of these lands began. *Id.* In any case, the Sokaogon, as parties to the *LCO* litigation, are bound by the final judgment barring usufructuary activities on privately owned land; the Court finds that this bar extends to the right to possess and occupy private land as well.

In this respect, Exxon is also entitled to summary judgment with respect to the land and mineral rights it owns in the subject territory. The Seventh Circuit's ruling in the *LCO* litigation, which interpreted usufructuary rights as extending to lands "not privately owned," undeniably excluded privately owned lands as subject to these rights. Exxon is a private corporation and the lands to which it holds title are subject to this ruling.

The Sokaogon have asserted that the distinction between private and public lands discussed in the *LCO* cases is not absolute, and there might exist privately-owned lands upon which they may exercise their usual rights of occupancy. They claim that the Court is not bound by *LCO* for three reasons. First, the land was conveyed by the United States to Exxon's predecessors for "quasi-public" purposes, namely a military wagon road and a railroad. Second, Exxon is distinguishable from a purely private owner because it is a "massive commercial combine." Finally, even if the land is privately owned, there exists an exception to the general rule when a tribe has

---

**24.** Since Exxon plans to purchase land owned by Forest County, it has also cited to the portion of *LCO II* which states that any usufructuary

rights existing on publicly owned land are extinguished when the land is sold to a private entity. 760 F.2d at 182.

demonstrated a need for access to a particular piece of property.

█ None of these arguments presents an arguable issue of fact. First, although the land was originally conveyed for roads and railroads, none of the parties dispute the fact that it is privately owned at present. When a court interprets Native American treaty rights, it must look at the ownership of the land at the time the attempt was made to exercise those rights. Since Exxon is a private entity and currently owns part of the subject territory, the land is privately owned for the purposes of this action. Therefore, these parcels are exempt from any remaining rights the Sokaogon may have in the subject territory.

Second, the fact that Exxon is a "massive commercial combine" is irrelevant. Exxon is a private entity that holds legal title to the land in the same manner as would any individual.[25]

The Sokaogon have culled the "need for access" exception from *LCO II,* 760 F.2d at 182, where the Seventh Circuit held that the mere conveyance of public lands into private ownership might not, by itself, extinguish the Chippewa's usufructuary rights. 760 F.2d at 182. Certain factual situations could conceivably arise in which a court might want to permit the Chippewa to exercise their rights even if the land had, at one time, been patented for private ownership at one time. The court suggested that there may be times when the Native Americans' rights would override the private owners' interests. For example, the Court feared that private landowners would buy public land simply to terminate the Native Americans' rights vested in that land, then reconvey the land back to the state after it had been "laundered." The Seventh Circuit has suggested that a district court conduct a factual examination of the circumstances surrounding the public/private transfer of land, presumably to determine whether the exercise of treaty

reserved rights is consistent with this transfer. *Id.*

█ While the Seventh Circuit did not set forth a bright-line rule for once-private lands, this Court sees fit to interpret *LCO II* as providing an extremely narrow exception to the general rule. This exception should only be invoked where public policy demands a deviation from established legal principles so that justice may be done. If the public is permitted to hunt and fish on private land, forbidding Native Americans from exercising traditional privileges on this land would be manifestly unfair. A court should also discourage "title laundering," where individuals might buy land from public entities to eradicate Native American rights. Both exceptions were mentioned in *LCO II.* In *Lac Courte Oreilles Band v. State of Wisconsin,* 668 F.Supp. 1233 (W.D.Wis.1987), the district court noted that if the Chippewa were unable to sustain a "modest standard of living" from the fruits of public land, arrangements could be made for them to use private land if they could demonstrate a "particularized need." *Id.* at 1432.

Even if a "need for access" exception exists, the Sokaogon have not demonstrated in this case that they have a particularized need to enter Exxon's property. Although the Sokaogon suggest that land containing ancient burial sites, places of religious significance, and community meeting places are not fungible and thus cannot be compared to lands used for hunting and fishing, they have not presented any evidence that any of these places exist within the subject territory. In fact, of the specific sites named in Fred Ackley's affidavit, none of them are alleged to fall within the ninety-three parcels within the Crandon Project territory.

Assuming *arguendo* that the Sokaogon still had the right to possess and occupy publicly owned lands in the subject territory, this right would extend to the land in Forest County that Exxon is in the process

---

**25.** The Sokaogon's illustration does not support a legal exception for "massive commercial combines." The fact that logging companies who abandoned their land have had their interests

described as "licenses" in law review articles does not change the nature of Exxon's legal title to the land.

of purchasing. However, these hypothetical rights would not exist indefinitely. The Seventh Circuit made it clear in *LCO II* that property rights are not static and can change once public land is conveyed to a private entity. Therefore, if the Sokaogon had rights of occupancy remaining in the subject territory, these rights would extend to the Forest County parcel. However, once Exxon closes on the parcel, the land's characterization will change from public to private, and the Sokaogon will no longer have any rights of occupancy.

Since Exxon's land is privately owned, the Sokaogon have no right to exercise usufructuary privileges upon it or occupy it. For these reasons, the Court grants Exxon's motion for summary judgment.

## C. REMOVAL FOR THE PURPOSES OF MINING

■ In its motion for summary judgment, Exxon has made a presumptive showing that the intent behind both the 1842 and 1854 Treaties was to open up vast portions of land in Northern Wisconsin and the Upper Peninsula of Michigan for mining. Indeed, the 1842 Treaty was commonly known as the "Miners' Treaty." If the Sokaogon were to prevent Exxon from mining on the subject territory, it would be in contravention of the very considerations prompting the two treaties. Even assuming that the Sokaogon have rights in the land, the language and intent of the 1842 and 1854 Treaties demand that mineral development should take precedence over those rights.

In 1976, the Sokaogon, along with other Chippewa tribes, successfully sued the United States under the Indians Claims Commission Act of 1946, 60 Stat. 1049 with respect to their mineral rights. *Minnesota Chippewa Tribe v. United States*, 37 Ind. Cl.Comm. 146 (Jan. 14, 1976). The Court of Claims found that the consideration given to the Chippewa in 1842 in exchange for the mineral rights to their land was unconscionably low.[26] The Commission recom-

puted the fair market value of the land at the time of the treaty and paid the tribes any balance owed to them. Because the Sokaogon were already paid for the mineral rights to the land, Exxon claims that they are estopped from asserting any rights to the mineral estate in the subject territory. *See Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) ("A right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies." *Id.* at 147, 99 S.Ct. at 971.)

The Chippewa apparently understood that they were relinquishing any claims they had to lands that would be necessary to the miners. If and when mining commenced on the land, the Native Americans were described as having agreed "to remove to one side," away from land which would be used for activities associated with mining, but not for mining itself. Exxon, App. at 938. The district court, in *Bouchard*, while remarking that the Chippewa might not have understood in 1842 that they were ceding their title to the land, concluded that they did know that they would have "to make way for mining and logging operations." 464 F.Supp. at 1137. Nowhere was there any acknowledgment of a presidential mandate as a prerequisite to removal.

The Sokaogon have not disputed that settlers could ultimately displace Native Americans from ceded territories when mining operations commenced. However, the exact words of the 1842 Treaty in Article VI empower the President of the United States, and no other person, to order the Chippewa to remove. The fact that some Chippewa have agreed to move off ceded land when asked by private owners does not, the Sokaogon contend, waive their right to presidential removal, but rather is evidence of their good nature and acquiescence. Therefore, if they are to be ordered to remove from the land, the Sokaogon

---

**26.** In other words, the Sokaogon have already sold the subterranean mineral rights in the subject territory. They now are seeking, in effect, to enjoin the recovery of these minerals by Exxon, since Exxon would probably be obligated to fence in mining areas for safety considerations.

demand that there be presidential review of Exxon's "good faith need for exclusion in the interests of mining." Sokaogon's Response at 25. Exxon states that a contemporaneous construction of the treaty shows that the Chippewa understood that they would vacate the land when the white men came to mine. A presidential removal was necessary only when the Indians refused to leave and harassed the miners. However, the Sokaogon countered that their predecessors' acquiescence and good nature should not be construed as a waiver of their right to the land absent removal by the President of the United States.

 Article VI of the 1842 Treaty holds that "[t]he Indians residing on the Mineral district, shall be subject to removal therefrom at the pleasure of the President of the United States." Exxon has presented evidence suggesting that presidential removal was obligatory only if the presence of the Chippewa interfered with the mining operations. This interpretation is supported by both the historical record (evidence that Native Americans acknowledged their obligation to "remove" once mining commenced) and by the fact that presidential removal was never required in previous instances where miners displaced the Chippewa. Although these explicit terms were not in the treaty, the practical construction of a treaty adopted by the parties is entitled to great weight. *Choctaw Nation v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). The Chippewa seemed to realize that they had an obligation under the 1842 Treaty, and the Sokaogon have not presented any evidence that this is not so. Therefore, this Court finds that a direct presidential order is not necessary to effect a removal, and the Sokaogon are required to vacate any off-reservation land they have occupied whenever mining commences.

When the Court takes into account the Chippewa's understanding and the history of the 1842 Treaty, it finds that there was an understanding that the ceded lands were to be used eventually for mining and that the Chippewa were meant to vacate the lands when the actual mining began. The Sokaogon had already intervened in the *LCO* litigation as plaintiffs when the district court set forth a comprehensive listing of the Chippewas' usufructuary activities in *Lac Courte Oreilles Band v. State of Wisconsin*, 653 F.Supp. 1420 (W.D.Wis.1987). Although circa "1837 and 1842, the Chippewa exploited virtually every resource in the ceded territory," harvesting of subterranean minerals is noticeably absent from the court's listing of activities. *Id.* at 1426. Because defining Native American privileges of occupancy demands a consideration of "the history of the treaty, the negotiations, and the practical construction adopted by the parties," *Choctaw Nation v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943), historical events prove that the Chippewa realized the ramifications that mineral development would have on their treaty-reserved rights and nevertheless entered into the 1854 Treaty.

### D. SOVEREIGN IMMUNITY

 The Eleventh Amendment provides that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." A modern-day interpretation precludes private individuals, corporations, foreign countries,[27] municipalities,[28] and Native American tribes[29] from bringing an action against a state in federal court, unless the state consents to suit or its immunity is abrogated by law or statute. This immunity extends to agencies and officials acting under the authority of the state. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). A state may waive its immuni-

---

**27.** *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934).

**28.** *Municipal Authority of Town of Bloomsburg v. Pennsylvania*, 496 F.Supp. 686 (M.D.Pa.1980).

**29.** *Blatchford v. Native Village of Noatak*, —— U.S. ——, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

ty by consenting to a lawsuit, or Congress may provide for private suits against states or state officials through legislation. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Absent these exceptions, it is clear that neither citizens nor foreign countries or states may sue any of the United States in an action for money damages.

Although many courts have spoken of the Eleventh Amendment as providing "sovereign immunity" to the states, in reality it is a jurisdictional bar. A state is technically not immune from suit by an individual under the Eleventh Amendment, but no federal district court would have proper jurisdiction over such an action. As the Supreme Court noted in *Employees v. Missouri Public Health Department*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), "[t]he history and tradition of the Eleventh Amendment indicate that ... a federal court is not competent to render judgment against a nonconsenting State." *Id.* at 284, 93 S.Ct. at 1617. Because this jurisdictional bar is not absolute,[30] it is necessary to examine the situations under which a state may or may not be sued in federal court.

Both the State of Wisconsin and the Sokaogon addressed the potential Eleventh Amendment jurisdictional bar before the Supreme Court reached its decision in *Blatchford v. Native Village of Noatak*, — U.S. —, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). In *Blatchford,* a group of Native Americans were precluded from bringing an action for money damages against the State of Alaska. Even though the Supreme Court recognized that Native American tribes are independent sovereigns, *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe*, — U.S.

—, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), it found no parity between tribes and sister states for the purposes of the Eleventh Amendment. While sister states have mutually consented to waiving their immunity from suits against each other, Native American sovereigns are generally immune to a state's legal actions for damages. To subject a state to a lawsuit while the tribe remains immune would set this system off-balance. The Court limited its holding to actions seeking monetary damages and declined to determine whether a claim for equitable relief would be barred as well. *Id.* — U.S. at —, 111 S.Ct. at 2586.[31]

[33] Even though both parties in the instant case were aware that *Blatchford* was pending, neither noted the distinction between legal and equitable relief. However, both types of relief were requested in the Sokaogon's complaint. Although *Blatchford* bars this Court from presiding over the Sokaogon's claim for monetary relief against the State of Wisconsin, there still exists a claim for declaratory judgment. This Court must determine whether this claim is barred by the Eleventh Amendment as well.

First, it is essential to note that *Blatchford* may be distinguished from the case at bar. In *Blatchford,* a state official, rather than the state, was the named defendant. While the Eleventh Amendment's jurisdictional limitations extend to state officials under most circumstances, there are times when a state official may be subject to the district court's jurisdiction when at the same time, the state itself would be immune.

The watershed case of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), has created a legal fiction which has

---

**30.** For example, the United States or a sister state may bring an action against another state, even when monetary relief is requested or private parties are joined as plaintiffs. *See* 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3524 at 124 (1984), citing *Spicer v. Hilton,* 618 F.2d 232 (3rd Cir.1980); *United States v. State Board of Equalization,* 450 F.Supp. 1030 (N.D.Cal.1978).

**31.** Because the Eleventh Amendment does not immunize counties from suit, this portion of the analysis is not applicable to the three municipal defendants. *See Lake Country Estates v. Tahoe Planning Agcy.,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (political subdivisions such as counties and municipalities are not protected by the Eleventh Amendment even though they exercise "a slice of state power." *Id.* at 401, 99 S.Ct. at 1177).

been roundly criticized and has created a great deal of confusion, yet which serves to check a state's power to enforce unconstitutional laws. In *Young,* a federal district court enjoined the Attorney General of Minnesota from enforcing a state statute which allegedly violated the Fourteenth Amendment. The Supreme Court held that the court's actions did not violate the Eleventh Amendment, since an unconstitutional enactment by a state was "void" and did not "impart to the [state official] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454. In other words, because a state may not authorize its employee to act unconstitutionally, the Attorney General was deemed to be "stripped of his official or representative character and subjected in his person to the consequences of his individual conduct." *Id.* Although the Attorney General's actions were regarded as individual conduct for the purposes of the Eleventh Amendment, they also violated the Fourteenth Amendment's prohibition against unconstitutional *state* conduct. While the Attorney General was an individual under an Eleventh Amendment analysis, he represented the state for the purposes of the plaintiff's Fourteenth Amendment claim. This inconsistent characterization provides federal jurisdiction through a neat loophole for potential plaintiffs seeking relief against state actions that may be unconstitutional.

In cases where an action is brought directly against a state, however, the Eleventh Amendment appears to be given a more literal interpretation, even when the claim involves an issue of constitutional magnitude. The Supreme Court has suggested that a state must be dismissed from a property dispute brought by an individual in *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), an admiralty proceeding *in rem.* A private corporation was permitted to serve process on state officials who were holding some artifacts

from an abandoned shipwreck pending the outcome of a declaratory judgment action. The Supreme Court held that the State of Florida was not immune from the process because it was served on state officials, not the state itself or one of its agencies. However, the majority opinion by Justice Stevens stated that if the State of Florida had been "named directly in the complaint and ha[d] not consented to the suit, it must be dismissed from the action." *Id.* at 684, 102 S.Ct. at 3314, citing *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978).[32]

Justice White's dissent in *Treasure Salvors* also supports this interpretation.[33] In his view, the State claimed to own the property, and the purpose of the proceedings was to determine whether the State had title to the sunken treasure. Therefore, the majority's analysis of *Ex parte Young* was misplaced. *Id.* 458 U.S. at 702, 102 S.Ct. at 3323. *Young* and its progeny were intended to apply in cases where the defendants were state officials, and a state's own sovereignty is not implicated at all in these types of cases, since the state official "proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. at 454. When the sovereign state is actually named in the complaint, however, there is no such analysis that may evade the plain language of the Eleventh Amendment.

■ In *Treasure Salvors,* it is clear that the Supreme Court assumed that a state may not be named in a complaint without consenting to be sued. Even when the relief requested is declaratory and the complaint alleges violations of the United States Constitution, a state still may not be sued directly absent some indication that it

---

**32.** The Court reiterated the same hypothesis later in its opinion as well. *See id.* at 691–92, 102 S.Ct. at 3318.

**33.** Justice White disagreed with the majority's holding that the State of Florida was immune to process when a state official or agency was the named defendant in the action.

has agreed to waive its Eleventh Amendment immunity. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), was a conditions of confinement case brought against the State of Alabama by a number of prisoners. Although both the district and circuit courts found that the conditions in the state's prisons violated the Eighth and Fourteenth Amendment, the mandatory injunction that was issued by the district court was invalid against the State of Alabama, since the court was found to have had no jurisdiction over the state as a sovereign entity. *Id.* at 781–82, 98 S.Ct. at 3057–58.

■ It is not clear whether the Sokaogon have a claim of constitutional magnitude against the State of Wisconsin. The dicta of *Treasure Salvors* indicates that a state cannot be named as a defendant in a proceeding to determine a property right. Even assuming that the Sokaogon could advance a takings claim under Section 1 of the Fourteenth Amendment, the holding in *Pugh* demonstrates that an unconstitutional act on the state's part may not waive its immunity. Therefore, whether the State of Wisconsin is accused of a constitutional violation or a mere violation of the terms of a treaty is irrelevant for the purposes of this analysis.

■ Nor does this Court find that 28 U.S.C. § 1362 circumvents the Eleventh Amendment's jurisdictional proscriptions. Section 1362 provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe ... wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." The Supreme Court has refused to find that § 1362 created a legal cause of action against a state official in federal court. *Blatchford*, — U.S. at —, 111 S.Ct. at 2578. The court's prescient ruling in the *LCO* litigation is in accord with *Blatchford*. *See Lac Courte Oreilles Band, et al. v. State of Wisconsin*, 749 F.Supp. 913 (W.D.Wis.1990).

The Eleventh Amendment and the Supreme Court cases interpreting it prevent this Court from exercising any jurisdiction over the Sokaogon's complaint as it pertains to the State of Wisconsin. As long as the State of Wisconsin is named as a party, the Eleventh Amendment precludes the plaintiffs from litigating its treaty rights in this forum. Of course, if this action had been brought against a state official, the Sokaogon would have been able to advance a stronger argument in favor of waiving sovereign immunity. Perhaps the Sokaogon will be able to amend their complaint at a future time to include state officials amenable to suit. However, the Court has no jurisdiction over the part of the complaint naming the State of Wisconsin, since the State of Wisconsin has never consented to this action.

### E. ETHNO-HISTORICAL ANALYSIS

■ Even though the Sokaogon have been unable to establish that there is a specific question of fact concerning their claims which would necessitate a trial, they state that summary judgment is nevertheless inappropriate. Many of the documents relied upon by the defendants, and the Court, are at least one hundred years old. They are admissible as an exception to hearsay under Federal Rule of Evidence 803(16), and their authenticity cannot be impeached under Federal Rule of Evidence 901(b)(8). However, the Sokaogon have averred that there is a real dispute as to the reliability of these documents, and expert analysis is required to determine the meaning of statements within their historical context.

In support of this argument, the Sokaogon have directed the Court's attention to case law in which "[t]he necessity of expert testimony to translate material, technical facts [was] a justifiable ground for denying summary judgment." *Sonobond Corp. v. Uthe Technology*, 314 F.Supp. 878, 881 (N.D.Cal.1970), citing *Ortman v. Stanray Corp.*, 371 F.2d 154 (7th Cir.1967). However, the cases to which the Sokaogon cite are all patent infringement disputes, where the district courts were unable to resolve complex factual issues without expert testimony. For example, in *Uthe*, the alleged misuse of patented technology might not have constituted infringement, since the de-

fendant had used this technology for non-patented activities. The court was unable to determine the extent of these activities, nor could it evaluate damages, without the assistance of experts to present factual evidence.

 In contrast, the factual basis of the Sokaogon's complaint concerns events that occurred surrounding the transfer of land by treaty. Although this sort of case is not common, the Court is certainly equipped to interpret treaties and letters written by lay persons in colloquial terms. Indeed, the interpretation of Native American treaties is a question of law and thus amenable to summary judgment. *United States ex rel. Chunie v. Ringrose,* 788 F.2d 638, 643 n. 2 (9th Cir.1986). Moreover, most of the ancient documents upon which this Court has relied are not ambiguous in the least. Even viewing the evidence in the light most favorable to the non-moving party, the Court has found nothing to refute the clear language of the 1854 Treaty and the records surrounding its history. The Sokaogon had the burden of coming forward and showing that the Court's reliance on otherwise admissible documents is misplaced. *Corrugated Paper Products v. Longview Fibre Co.,* 868 F.2d 908, 914 (7th Cir.1989) (non-moving party bears burden of "shaking" the veracity of opposing party's facts). They have failed to prove the existence of material facts.

The Sokaogon have speculated about different interpretations that several documents might be given, but have not submitted expert affidavits supporting their hypotheses. The only expert named in their brief is Professor Charles Cleland, who testified during the *LCO* litigation. The Sokaogon have provided excerpts of his testimony which discredited documents used in the case because none of the documents were written by the Chippewa and many of the interpreters were biased.

However, there is no attached affidavit from Dr. Cleland or any other expert which would cast doubt upon any of the letters, petitions, or records used by Exxon in its motion. A party defending against a motion for summary judgment may not raise a genuine issue of material fact by speculating as to what an expert might say or by relying upon unreasonable interpretations of otherwise clear language. The party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). These facts may be shown by affidavits, depositions, answers to interrogatories, or admissions on file. Fed.R.Civ.P. 56(c). It is apparent that the Sokaogon have not met their burden.[34]

## VI. CONCLUSION

For the reasons stated herein, this Court GRANTS all of the defendants' motions for summary judgment. The Sokaogon no longer have the right to possess and occupy off-reservation lands within the subject territory; even if these rights had been retained, they would not have been able to exercise them on privately-owned lands or lands associated with mining. Therefore, summary judgment in favor of defendant Exxon is proper.

Moreover, this Court does not have jurisdiction over the portion of the Complaint which purports to state a cause of action against the State of Wisconsin, since it is barred by the Eleventh Amendment. Summary judgment on the merits would have also been granted to the State due to the abrogation of the Sokaogon's right to possess and occupy by the 1854 Treaty.

SO ORDERED.

■

**34.** The Sokaogon have attempted to shift the burden of proving the reliability of the ancient documents to the defendants. However, once the documents have been authenticated, they are presumed to be reliable, and the non-moving party questions their reliability, he must bear the burden of impeachment. *See e.g., Cor-* *rugated Paper Products,* 868 F.2d at 914. Even when the non-moving party is a Native American tribe, the Court shall still hold firm to this allocation of burdens, since Native Americans' relative disadvantages in dealings with the government are taken into account when interpreting treaties.